SAFETY-ARMORITE CONDUIT CO. v. MARK et al.

(Circuit Court of Appeals, Sixth Circuit. June 5, 1913.)

No. 2,342.

PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — PROCESS OF ENAMELING METAL SURFACES.

The Garland & Garland patent, No. 611,900, for a process of treating and enameling metal surfaces, *held* not anticipated, valid, and infringed.

Appeal from the District Court of the United States for the Eastern Division of the Southern District of Ohio; John E. Sater, Judge.

Suit in equity by the Safety-Armorite Conduit Company against Cyrus Mark, Anson Mark, and Clayton Mark, partners as the Mark Manufacturing Company. Decree for complainant, and defendants appeal. Affirmed.

The following is the opinion of Sater, District Judge:

The complainant charges the infringement of its patent No. 611,900, issued to Robert and John W. Garland, October 4, 1898, for a new and useful method of treating metal pipes. The defense is anticipation and want of invention.

The patent particularly relates to the cleaning of metal pipes, such as are installed for use in buildings as electrical conduits. The pipes vary in diameter from one-half of an inch to three inches and are ordinarily about ten feet in length. Their use has become extensive; the complainant alone selling from 18,000,000 to 24,000,000 feet per year. The National Board of Fire Underwriters imposes on manufacturers, builders, and owners rigid requirements as to the character of such pipes. To avoid the tearing and wearing of the insulation of the wires drawn through them, and the consequent loss occasioned thereby, it is exacted that their interior surface shall be not only enameled, but smooth. The patentees state in their specifications that prior to their discovery of their method pipes which were enameled or otherwise coated on their inner surface, for use in carrying electric wires, contained small projections and particles of slag or scale, and when the wires were drawn through the pipe they contacted with such obstructions, tearing away the enamel coating and destroying the insulation of the wires. They declare that their invention overcomes this difficulty by a cheap and simple method of giving a smooth, even, inner surface before the enamel or coating is applied to the pipes. The method of treating the pipes under their invention is to submerge the pipe in a weak solution of acid, preferably sulphuric acid, and then remove the pipes and subject its interior to a blast of air containing abrading material, preferably sand. The scale and slag causing the roughness and obstruction in the interior of the pipe, being loosened by the acid, is dislodged and driven out by the sand blast, and the smooth interior surface thereby produced is well adapted for receiving the enamel. The interior coating is then applied, either by dipping the pipe into a bath of the coating material, or in any other suitable way. The advantages claimed for the invention are a much better article than was theretofore possible by a method of preparing the inner surface which is cheap, rapid, and easily carried out. The patentees do not limit themselves to any particular solution for loosening the scale or of applying the acid and blast. Their process of treating the interior surface of metal pipes is thus seen to consist of (1) applying a dilute acid solution thereto, or pickling the pipes; (2) driving a blast, provided with an abrading material, through the pipes *after* the completion of the pickling operation; (3) the enameling of the treated surface; and such are the successive steps set forth in their two claims.

Although the patentees' method of treating metal pipes may be but a slight advance over the prior art, it results in the production of a highly ⁻seful

article, and involves novelty and patentable invention sufficient to justify the issuing and sustaining of the patent. Long prior to its grant, the cleansing of the interior and exterior surfaces of pipes, as well as of the exterior surface of other metallic articles, by pickling in a dilute acid, was extensively practiced, as appears from the British and American patents offered in evidence. Sand blasts had long been used for the same purpose, and for removing obstructions and projections from the interior of pipes. The enameling of their interior was also familiar. Some of the prior patents cover merely a method of enameling, or of enameling and glazing; others, a method of pickling, followed by washing or boiling in hot water; others, a method of pickling and a subsequent cleansing with a brush or sand and water; in still other instances, to one or more of these steps was added some sort of a coating to the metal treated. Mandrels had been used to remove scales and other deposits and obstructions from boiler and other tubes. Blasts of steam and air had been employed for the same purpose, or to cleanse the exterior surface of bodies, and sand blasts had been used in connection with pickling. But, whatever were the methods employed, it is not shown that any one had ever practiced the same or combination method devised by the patentees, or obtained the same result. None of the elements entering into the method or process is in itself claimed to be new; but it is the use of them all, and the new combination of them all, and the securing of a new and useful result thereby, that constitutes the basis on which the patent rests, and that justifies the finding of patentability. Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241; Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177; Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000; Kermentz v. Cottle Co., 148 U. S. 556, 13 Sup. Ct. 719, 37 L. Ed. 558; Western Electric Co. v. Millheim Electric Telephone Co. (C. C.) 88 Fed. 505.

The increasing use of electricity for light and power purposes created an extensive and growing demand for the installation of metallic pipes imbedded in the walls and floors of large buildings, as containers of insulated electric wires. The annoyance and loss from grounded circuits, the danger of loss by fire occasioned by the destruction of the covering of the wires, and the tearing away of the enamel when wires were drawn over or against rough places, or sharp and projecting points in the pipes, called for a perfection not theretofore known in their interior finish. A new use had arisen for small pipes, demanding a nicety, a precision, a smoothness in construction, as regards their interior, not previously required. When they come from the mill, there are present on their interior surface scales and some rust. These are ordinarily removed by the acid pickling, which destroys their connection to the pipes; but in so doing it also to some degree dissolves and pits the interior surface of the pipes, and leaves in them salts of iron and a gummy or collodial coating. Adhering particles, and the projecting parts of particles imbedded in the iron, produce roughness. If loose and partially adhering particles remain, the enamel does not affix itself to the interior surface of the pipes, nor can it have a solid bearing on such particles, nor will it always wholly cover the rough and sharp projecting edges of such particles. So long as imperfections, whether consisting of rust, blisters, burrs, slivers, sharp edges or points, or of obstructions of any kind, exist which interfere with the ready pulling of the wires through the pipes, or tend to injure their covering, the pipes or tubes are commercially objectionable, and their use is condemned if such imperfections exist to any marked extent. Resort was had to various devices to free the interior of the pipes from such faulty features—such as washing them, subjecting them to hot water to remove the acid, blowing air or steam through them, ramrodding and reaming them by machinery, tumbling them in a revolving barrel, cleansing them with brushes, drawing wire rope through them, placing them on a lathe and hammering them as they revolved, driving sand and steam through them, etc.; but none of these expedients were found effectual. As the result of much experimenting, the patentees hit upon the method set forth in the Garland patent. The practical effect of driving through the pipes a blast provided with abrading materials, after their pickling, is to remove all, or substantially all, loose particles, acid and acid effects, to wear off sharp and

projecting surfaces, smooth the interior surface, and leave the tubes, without any other needed treatment, ready for receiving the enamel. From this it necessarily follows that the sand blast dries the pipes; for, were it not so, and were the pipes left in a moist condition, they would be subject to rust, and would consequently have to be dried and probably further treated to remove such rust, before the final step of enameling is undertaken.

It is urged that the patent does not mention all of the beneficial results now claimed and found to follow from the sand blast treatment. The file wrapper shows that the removal of acid was in contemplation. It, and the patent also, disclose that the tubes were to be left in a condition for enameling at the conclusion of the sand blasting. That fact as clearly appears as if it were affirmatively stated. It must follow, therefore, that the sand blasting operates as a drier. An inventor's failure, when he perfected his apparatus or process, to foresee all of its results, does not invalidate his patent. He is entitled to its use for every purpose to which it is adapted (New Process Fermentation Co. v. Koch [C. C.] 21 Fed. 580), and whatever the patent fairly covers the inventor is entitled to, although its complete capacity is not recited in the specifications and was unknown to the inventor prior to the issuing of the patent (Diamond Rubber Co. v. Consol. Tire Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527).

The method prescribed in the Garland patent differs from that set forth in the British patent to Cowper-Cowles, No. 16,507, which was issued in 1893, and is thought by some of the expert witnesses to be more nearly anticipatory of the patent under consideration than any other. His patent relates to a method of and apparatus for pickling the exterior of metallic articles preparatory mainly to their receiving a coat of metal or of metallic compound, but which is also applicable to pickling them for any other purpose. His specifications provide that "in some cases it is advantageous to treat the articles *before* pickling, and *in intervals* of the process of pickling, with a sand blast." He contemplated the use of the sand blast merely as auxiliary to the cleansing action of the acid, and not as a step following the completion of the pickling to remove all prior obstructions, traces of acid, of cutting and projecting elements and other objectionable and rough features, but a step intermediate to a succession of tube immersions in the pickling solution. He states no method of applying the sand blast and no treatment to be given subsequent to the pickling and prior to the coating. His patent contains no suggestion of a method of treating the interior surface of pipes, or a complete unitary method such as that devised by the Garlands. The sand-blasting process under the Garland patent takes place *after* the pickling. It was manifestly this difference in the time of applying the sand blast that mainly, if not entirely, induced the Patent Office to grant the Garland patent, notwithstanding the disclosures of that of Cowper-Cowles.

Under the recognized rule as to the extent to which foreign patents are held to be anticipatory, the Cowper-Cowles patent cannot be held to defeat the one here in question. Seymour v. Osborne, 11 Wall. 516, 560, 20 L. Ed. 33; Hanifen v. Godshalk Co., 84 Fed. 651, 28 C. C. A. 507 (C. C. A. 3); New Process Fermentation Co. v. Koch (C. C.) 21 Fed. 580; Carnegie Steel Co. v. Cambria Iron Co. (C. C.) 89 Fed. 721, and 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968; Western Electric Tel. Co. v. Millheim, supra. Even as to domestic patents, the Garland method is not invalidated by statements in an earlier publication, unless those statements are full and definite enough to inform those skilled in the art how to put in practice the patented Garland invention. Moreover, a process patent can only be anticipated by a similar process, and no such process as that set forth in the Garland patent is shown in any prior patent. It is not sufficient to show a piece of mechanism by which the process might have been performed. Carnegie Steel Co. v. Cambria Iron Co. It is significant that the disclosures of the many earlier patents cited by the defendant did not result in the application of the prior patentees' method to the preparation of tubes to carry electric wires.

The Roberts patent, No. 582,952, May 18, 1897, was also cited by the examiner for the rejection of the first three original claims in the Garland application and is relied on here as anticipatory. That patent relates to the

cleaning of the surface (exterior) of bodies, and is for a method of cleansing by the use of an acid and scouring by means of brushes and water. The application and claims of the Garlands as amended were deemed by the examiner—and correctly, I think—to distinguish their method from that of Roberts, else their patent would not have been granted.

After the Garland patent issued, Tilghman & Brooksbank in 1902 made application for a patent for the same method and an allowance of the same claims. They were the owners of the Tilghman patent, No. 108,408, October 18, 1870, for an improvement in cutting, grinding, boring, dressing, pulverizing, and engraving the exterior surfaces of stone, metal, glass, and other hard substances, by means of a stream of sand, or grains of quartz, or of other suitable material, propelled by a rapid jet or current of steam, air, water, or other suitable gaseous or liquid medium, or other direct force. It did not involve the pickling process. In the 32 years which have elapsed, their method, in so far as the record discloses, was never applied to the cleaning of the inner surface of tubes. The interference declared between the Tilghman & Brooksbank application and the Garland patent terminated in a decision on concession in favor of the latter. The concession made, according to the evidence of John W. Garland, was the priority of the Garland invention. The result of the interference proceeding is not binding on the defendants, who were not parties to it (Wilson v. Consolidated Store-Service Co., 88 Fed. 286, 288, 31 C. C. A. 533 [C. C. A. 1]; nevertheless it has some weight favorable to the complainant in determining the validity of its patent (Westinghouse v. Stanley, 133 Fed. 167, 68 C. C. A. 523 [C. C. A. 1]).

The evidence of John W. Garland is that various futile experiments were made to produce an acceptable commercial tube, before the patented method suggested itself. The witness Flack, who was experienced in metal and tube manufacture, details expedients tried by the American Conduit Manufacturing Company, which finally adopted the Garland method. His company, he says, was compelled to use the sand blast as the finishing step in the preparation of pipe for enameling, or else give up the attempt to manufacture electrical conduits, and after making a pretty thorough search among users of the sand blast, to ascertain whether it had ever been used prior to the issuing of the complainant's patent for scouring the interior surface of tubes, it found that the manner of scouring employed in the manufacture of bathtubs was the thing nearest to complainant's method, and that was not satisfying. When his company was sued for infringement, a compromise was effected whereby it received a license permitting it to proceed according to complainant's method. The witness Smith, who was in charge of the Armorite Interior Conduit Company, and who had held other important positions in manufacturing plants, recites the unsuccessful efforts of his company to produce a commercial pipe that would acceptably meet the requirements of the trade. It found itself unable to compete with complainant, and, having no satisfactory method of successful pipe production, it "stole," he said, "the [complainant's] process of sand-blasting." Garland names other manufacturers that adopted complainant's method (page 299), only to relinquish the same or wholly retire from business when their right to use the same was challenged. The defendant, in its efforts to produce a high grade of merchantable pipe, with knowledge of the existence of the Garland patent, also, after trying various methods, adopted the process therein described, purchased a machine constructed for use in connection therewith, and used it for a period of from four to six weeks immediately prior to the beginning of this suit. It thus appears that, as soon as competitors learned of the Garland method, they one after another appropriated and used it, until called upon to defend their right to do so, and this none of them were willing to do. Their conduct bespeaks the merit of the invention. That others skilled in the art sought to accomplish the results attained by the patented method, and failed in their efforts, and that there has been a very general acquiescence in its validity, may be and usually are evidence of invention, and not merely of judgment and skill on the part of the Garlands in conceiving and producing it. American Graphophone Co. v. Universal Talking Mach. Mfg. Co., 151 Fed. 595, 81 C. C. A. 139 (C. C. A. 2); 30 Cyc. 861.

The mere fact that the method and its product possess great commercial advantages, went promptly into extensive use, excluded other manufacturers as competitors, and displaced other methods and pipes produced thereby, which had previously been employed for carrying electric wires, does not necessarily establish that the Garland patent involves patentable invention; but it may be considered, as may also the presumption of validity arising from the granting of the patent, in determining the question of patentability, and if the other facts in the case leave the question in doubt, is sufficient to turn the scale. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 495, 496, 23 L. Ed. 952; Streator Cathedral Glass Co. v. Wire Glass Co., 97 Fed. 950, 38 C. C. A. 573 (C. C. A. 7). The production of tubes according to complainant's process has secured economy and speed in the manufacture of a useful article. Where the result produced by a method is an improvement in the trade, and is for the public good and advantage, by the manufacture either of a new, or better, or cheaper article than that produced by other methods, such result is evidence of patentable novelty and utility. Jones v. Wetherill, Fed. Cas. No. 7,508; 30 Cyc. 826, 827; National Tube Co. v. Aiken, 163 Fed. 254, 91 C. C. A. 114 (C. C. A. 6). Notwithstanding the demand for improved tubes for conduits to care for electric wires, neither the manufacturers who invested their capital, nor their employés, nor men learned in the science, who acted as their advisers, saw and did what the Garlands saw, and, after protracted effort, did. This implies novelty and patentable invention. The simplicity of the process described in the patent does not depreciate its value or establish want of patentable invention; but when a patentee gives to the world a new combination of old elements, whereby a new and useful result is obtained, his patent should be sustained, even if the changes in mechanism or method by which the result is produced are not difficult. Stewart v. Mahoney (C. C.) 5 Fed. 302. It is the last step that wins, in the law of patents. Barbed-Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 450, 36 L. Ed. 154; Streator Cathedral Glass Co. v. Wire Glass Co., supra.

In the oral argument attention was directed to the evidence of complainant's expert, Smith (page 327), to the point that, previous to the granting of the patent involved, "it was customary to clean the interior of conduit pipes, previously to their enameling by pickling in acid, by scouring and abrasion, either by wet scrubbing with sand or by sand blasting, or by forcing a mandrel through the pipes, by which the rough surface was smoothed." Inasmuch as the witness did not state the order in which the sand blasting occurred, in view of his evidence as a whole and especially as given on pages 335, 336, 337, etc., it cannot be held to support the defendants' contention or to conflict with the conclusion reached.

It is urged that the defendants have developed a method of treating pipes which produces the same result and as good or even better pipes than can be had by the use of complainant's process. This constitutes no defense. Their ability to produce the same result as complainant by another and different method does not affect the complainant's right to an injunction. Du Bois v. Kirk, 158 U. S. 58, 15 Sup. Ct. 729, 39 L. Ed. 895.

In view of the fact that the defendants are the owner of a machine designed for the manufacture of tubes according to the complainant's process, an injunction may go.

Charles Neave, of New York City, and James K. Bakewell, of Pittsburgh, Pa., for appellants.

C. P. Byrnes and Geo. H. Parmelee, both of Pittsburgh, Pa., and E. Rector, of Chicago, Ill., for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. This was a suit based upon the two claims of the Garland & Garland patent, No. 611,900, dated Oc-

tober 4, 1898. The patent relates to the treatment and enameling of metal surfaces, and particularly the interior surfaces of metal pipes. The complainant below holds the patent through assignment of the patentees. The defenses were anticipation and lack of invention. The cause was heard below on the usual pleadings and upon proofs taken by both parties. The validity of the patent and the charges of infringement of both claims were sustained, an accounting and injunction were granted, from which this appeal was allowed and is maintained. Judge Sater's decree in the court below was the result of minute examination and a considered opinion. It is not necessary, however, to pass upon its entire reasoning. Our examination of the record leads us to a unanimous approval of the conclusion.

The decree is therefore affirmed, with costs.